Having paid close attention to the last oral argument, I'm not going to sit down. I have ceded five minutes of my time to Amicus Curiae of the Department of Justice, and I'd like to reserve three for rebuttal. So that makes 12 minutes on the honor's roll. And I assume that the Court would like me to start with the issue on which they sent the order on February 3rd, which has to do with whether or not the – as I interpret the three cases cited, it has to do with whether or not the United States is a necessary or indispensable party. I sent a Rule 28J letter last week. I hope the Court received it. And the short answer is, I think, that you can uphold the regulation as non-arbitrary and capricious, as this Court has done in previous challenges under the ADA. But I think it would be very difficult to say that the district – to uphold the district court and say that the regulation is arbitrary and capricious when the interests of the United States are so inextricably intertwined there. So that was really my question, is if we were to rule in your favor, you're telling us that, in your view, we could do that without the presence of the United States as a party. But were we to rule against you and, in effect, uphold the district court, then your position is the United States would be an indispensable party. Is that correct? Yes. And, in fact, the cases I cited to you indicated that the Court did not have jurisdictional or other concerns where it upheld a regulation under the ADA against a challenge either constitutional or regulatory. Both of the cases I cited, the – I know I'm going to mispronounce this – the Chazabal case and the Deere case involved challenges to the regulations as unreasonable interpretations of the statute. So the Court – and, in my view, since this is a question of law, and as I don't think it's in serious dispute that this is a question on which, when you attack a regulation as arbitrary and capricious, the plaintiff bears the burden of proof, I think that answers – that is the way to answer this question. The plaintiff bears the burden of proof – bears the burden of coming forward with something that shows that the regulation is arbitrary and capricious. And they had an opportunity to do that in this Court, and they did not do so. Instead, they said, we, BART, did not come up with any – showing that either the Department of Transportation or the Access Board had considered the accommodations that they prefer. That kind of bare assertion should – should lead to a – affirmance of the – of the regulation right off the bat, a bare assertion not showing that – that doesn't show that it's arbitrary and capricious. We did come up and show from the regulatory record that, in fact, the Access Board had considered these things in detail. But the preliminary point is, if you're going to attack a regulation as arbitrary and capricious, you have to attack it in light of the regulatory record. You cannot say that a decision about the evidence is unreasonable unless you know what the evidence was. And the plaintiffs had an opportunity to bring that evidence before you, and they didn't. I think it's one thing that the – saying that they really didn't have an opportunity to rule on it at that time because they didn't have enough research. And 13 years later, they have done nothing about it. Well, I think that – that gets to the irony of Judge Wilkins' ruling, which is that these provisions are arbitrary and capricious because the DOT regulations, which incorporate the Access Board regulations, don't have a signage regulation similar to that of the DOJ's. But the plaintiffs and their experts all said that the signage was not a viable solution for those plaintiffs. In other words, their experts said directional signage – and that's what the DOJ regulations is – directional signage is necessary. The plaintiffs testified at 639 and at 647 in the record that they don't look at signs. And – What about the painting of the stairs? Well, see, that's the second point. Judge Hugg's question was, well, what about this supposed inaction for 13 years? What happens is we all – both, I think, the plaintiffs and the defendants, or at least BART, agree that directional signage, as required by the DOJ regulations, is not a solution for this population of the disabled. Therefore, the question is – the plaintiffs say, well, then we need to have contrast striping on stairs. And in fact, as we show, particularly in the reply brief, the Access Board considered contrast striping on stairs beginning in 1991. There is clear evidence in the record that it is considered carefully, the issue of contrast striping. What happened in 91 was they said – It took no action. Well, in fact, it did take some action. What it said was in 1991 was there have been comments from some commenters – I'm paraphrasing, of course, but it's something along the lines of some commenters have suggested contrast striping on stairs. We have seen no evidence that this is effective as a way finding need. And in accordance with our intent to follow the A117 Committee's recommendations – the A117 Committee of the International Code Council – I get confused, but I hope I've got it right. We're going to follow the A117 Committee. The A117 Committee studied the issue for seven years. And in its 1998 recommendations for incorporation into the International Code – Wait a minute. They studied for seven years what striping on stairs? Yeah. I mean, let me just put it this way. In 1991, they began studying it. In 1998, they came out with the latest version. And there were no striping on stairs. But in 2004, when the Access Board finally came out with a new set of access regulations, they included an advisory that said to the builders of new construction, consider placing contrast striping on stairs. So this is an incremental, experimental approach to see if this works. This is not an arbitrary and capricious decision. Well, we don't know what we're going to do, and we're not going to do anything about it at all. It is an incremental approach that says we are going to try these things, but we're not sure. The question here is efficacy. And – Well, what is the adverse side of putting striping on stairs? I mean, what harm is that going to do to anybody? Well, the harm in this case is that it tells – in the context of an ADA enforcement action – is it says the Department of Transportation's safe harbor provision, 28 CFR section 37.9, doesn't mean anything. You, Bart, or you, Caltrans, or you, any other – I'm talking about the Access Board deciding and saying, well, it might help put some striping on the stairs. So what would be the matter with that? How would that harm anybody to put striping on the stairs? I don't know the technical reasons for why the Access Board has not adopted a contrast striping requirement up to this point, except that I have seen some references in there that say that there's a question whether or not putting them on every stair makes the staircase look flat rather than top and bottom. And there are disputes over what they are. I think the record itself demonstrates exactly the kind of sticky technical issues you get into when you talk about contrast striping, because you have the plaintiffs claiming that the 19th Street station of Bart, which has – because it was revamped – reconstructed, I guess is the word I wanted – was required to put contrast striping on all the stairs there. Well, the plaintiffs' argument throughout until the summary judgment against them was that contrast striping, which complies with the California Building Code, is insufficient because it gives off too much glare. It's one of those technical issues that the Access Board, and not the courts, is both delegated and competent to answer. They have tried to find this sort of stuff, and they are experimenting. I noticed in my research, catching up with this, that at this point they're trying to experiment in various places with talking signs, but there are all sorts of problems with talking signs. If they're on the FM band, there's interference from radio signals in the city. If they're in other bands, somebody has to have a special receiver, which may be expensive. These are all kinds of tradeoffs that have to be made to determine what the wayfinding needs would be. But I think that the point here is that the way the plaintiffs have set up this argument – and if you look at page 30 of their brief, it's quite clear – the safe harbor of the Department of Transportation regulations means nothing, because they say in their brief – and again, I'm paraphrasing because I'm not good at remembering exact quotes – they say in their brief, you know, ADAG and the Department of Transportation cannot anticipate every possible need of the disabled population, and therefore the court needs to go outside the regulations to find what will be most effective for a particular population of the disabled. Well, that means that the safe harbor means nothing, as long as a plaintiff can come in and say, I would prefer a better type of regulation or a different regulation or a different – excuse me, I'm using the wrong word – accommodation. I think their argument is a little more nuanced than that, and that would be if the regulation is arbitrary and capricious, then that in effect negates the safe harbor or however one might characterize it. Well, I would assume if regulations are arbitrary and capricious, one would have to say that a safe harbor inside the arbitrary and capricious regulations is no help. But we have to come to the – of course, come to that first huge step of saying – I mean, because there's another way to look at it, and that would be that the regulation could be arbitrary and capricious, but that there could be a shield for public transit who had followed it, although they would have to change it going forward. It puts you back with DOT, why they would be a party to the lawsuit to begin with. Right. And I think that one of the fairness issues that the Court has to consider in this respect, and I'm glad you brought this up, Your Honor, is that had the district court had the plaintiffs from the beginning issued a complaint that said, you comply with DOT regulations, but we believe that those are arbitrary and capricious, we would have known that the particular regulations were at risk, and we might have decided not to litigate this case. We might have said, well, who knows what's going to happen down the line, but if this is what they want, the striping on the stairs, we'll do that. But instead we fight this fight over our compliance with the regulations for two and a half years, and at the end of it the judge says, oh, those regulations that you complied with in every way are arbitrary and capricious, and you're liable for the plaintiff's attorney's fees. I think that's a basic fairness question that goes to what needs to happen now. And what needs to happen now, I believe, is a completely reversal, not a remand for the plaintiff. We again are talking about who comes forward with evidence of arbitrariness and capriciousness. If you don't bring the regulatory record before the court, you can't make that claim. I was just wondering if you're leaving five minutes, and you want some rebuttal. I'm sorry. I wasn't paying attention. We'll give her extra time as well. Thank you. Thank you, Judge Hugg, for protecting my interests. Your Honor, and may it please the Court. The United States' interests in this case are slightly more narrow than the BART's interests. The regulations, the ADA itself gave an express delegation of power to the Department of Transportation to develop regulations regarding public facilities that provide public transportation. A federal agency Is a public agency excused from compliance with the ADA? No, sir. Let me finish. If the agency takes no action to provide ready access for visually disabled people? If a federal agency, I mean, I think that there is a due process issue, kind of a basic Matthews v. Eldridge point. I mean, the whole purpose of, we can't require federal public agencies like BART to operate within the specific regulations that the DOT developed or any other agency and then say once they complied with those that they're subject to liability. I mean, on the other hand, they do have an obligation to comply with the federal law. Our concern here is that the Department of Transportation has never had an opportunity to defend these regulations. Regulations are entitled to a presumption of regularity. We didn't even have notice that these regulations were going to be challenged. Suppose I agree with the proposition that the district court was wrong in saying this regulation was arbitrary and capricious as to physically disabled people, but at the same time concluded that BART for 13 plus years has taken no action to provide ready access to visually disabled people. Is BART immune then? If BART is complying with the federal regulations, the federal regulations provide a safe harbor for that entity. So in that sense, and if the regulations are entitled to a presumption of, I mean, as long as Even though the regulation does not provide access for visually disabled people. In this case, Your Honor, the access board, it's not as if there has been a blind rejection of any type of protection. I mean, this issue was considered in 1991. It was considered again by various boards in 1998. In fact, there's a notice of proposed rulemaking on the Transportation Secretary's desk right now. But the reality is, and I know that bureaucracy works slowly, but the reality is this is not a simple issue of the Department of Transportation or even the access board having done absolutely nothing. There are a lot of technological, architectural considerations that come into play when you're dealing with, like, a subway system that is a vast expanse, often has very few, sometimes it has many entrances, the doors are, there's not a single area where you could put it in, and some of the other factors that Council for BART had brought up. So, I mean, it is a subject that is being considered and studied. Not fast enough, I concur. What does this mean, then, 37.9? It means if the DOT is not arbitrary and capricious, then BART's off the hook as long as it complies? Yes. Okay. But then, apropos of Matthews v. Eldridge or others' cases, if it turns out the regulations do not match the law, then is there any safe harbor for BART? I think that a plaintiff could certainly challenge the regulations. I mean, that would be entirely feasible as long as they brought the Federal government into the action and gave us an opportunity to develop a factual record. I mean, I thought McAllen, one of the cases you cited, was on point in that regard. But you can't simply sue a public entity like BART without giving the Federal government, who has been charged, this is our regulation. Yes, but that doesn't really answer if – let's just assume you were there. Okay. And we're now back in the district court and somehow – and you got to be there in the ordinary court. And it were determined that the regulation is arbitrary and capricious and the DOT was remanded to the DOT to tidy up, to be compliant with the law. What would be the effect of 37.9 in that case? If we were there, if we'd been given an opportunity and then despite all that, the district judge determined that the regulations were invalid, were arbitrary and capricious, then I mean, I think that there could be some liability for the defendant in that case. I mean, we – because – Well, I mean, the regulations can't trump a statute. So, I mean, on this issue, where our position here is probably not identical to BART's. But the reality is, is that the entities have an obligation to carry – to enforce the statute itself and not simply the regulations. On the other hand, we, that is the Department of Transportation, have an obligation to adopt regulations as expressly delegated by Congress. Those regulations are entitled to a presumption of reasonableness. And so there is a very high standard for a plaintiff to have to overcome. And there is an issue of basic fairness, though, to a public transportation entity who is complying in good faith with the Department of Transportation's regulations. So, I mean – What is your position with respect to the United States as a party? I mean, you've indicated that they are the appropriate party because it's their regulation, DOT's regulation that's being challenged. BART takes the position that if the district court were reversed, in other words, if the regulation is upheld as not arbitrary and capricious, then it doesn't matter that the U.S. is a party or not. What's your position on that? My position on that is I actually agree with BART for this reason. A regulation is entitled to a presumption of regularity. So if that – if there is an absence of proof that the – in anything in the record to establish arbitrary and capriciousness, then there's no reason at that point for the government to have to be a party. If, on the other hand, there's going to be a challenge and we're going to actually try to flesh out the record in that regard, then the United States has to have an opportunity to defend itself. So your position is if – if this court were inclined to agree with the district court with respect to whether the regulation complies with the law, that the case would have to be remanded and the U.S. put in as a party under Rule 19? Yes, except that – I mean, I don't – with respect, I don't think this court would be able to agree with the district court given the – because there's – there's been no – nothing in the record – the United States has never been given an opportunity. At most, what I would respectfully submit you could say is there is – we are troubled enough here that we could – that we feel uncomfortable upholding the regulation as reasonable, but we are not going to make – you cannot make a finding that it is arbitrary and capricious without giving us the opportunity to create a record in the district court and identify why we think it is reasonable. And with that, I should probably give the rest of my time to co-counsel. Thank you very much. Thank you. Good morning. Patricia Barbosa for Apelli. I would like to first indicate to the Court that if the Americans with Disabilities Act means anything, it means there is a strong congressional mandate to provide real, genuine, and fair access for persons with disabilities to allow them to enter the public forum. In particular, transportation facilities are especially important for persons with visual impairments because, unlike a person in a wheelchair or a person who is deaf, they rely on public transportation since they're not allowed to drive. Now, I think one of the difficulties in this case has been that when plaintiffs sued BART, we did not say you failed to comply with one signage regulation in the Department of Transportation. We said you have discriminated against plaintiffs on the basis of their disabilities in the way that you are providing your program services and activities. Appellants were quite successful at the lower-level district to narrow the scope of the inquiry to one sign and an accessible wheelchair route. That's not the issue that's properly before this Court because we have actually indicated and briefed the issue of whether or not the program services and activities are being provided. Now, I do want to indicate that it is possible for us to agree with the Department of Justice here in the sense that if the Court – there would be a necessary party if the Court were going to find that, overturn the district court's decision. But I think that the Court can – But is there a necessary party in the district court for the district court to have made a finding that the regulation was arbitrary and capricious? Because the original question of the safe harbor, which is what's arbitrary and capricious, the decision of the district court, was never raised until a motion for reconsideration that was put in by appellant, by the defendants at that point, after they lost their summary judgment and plaintiffs won their cross-summary judgment. So that's the first time that it came up. It isn't that the plaintiffs were talking about how arbitrary and capricious the DOT regulations were. It's that the department – it's that the defendants said, aha, there's a safe harbor here that says we're accessible even if people are walking off the stairs, cannot find the entrances, cannot locate the platforms of the train stations. We are de facto accessible and you have no ability to get us to do anything. Now, I do have to – Do you agree with the basis for the district court's decision? I agree with the basis for the district court's decision if it is correct, and I believe it is incorrect, that the Department of Transportation regulation is the exclusive and only issue having to do with a sign on the wheelchair access route. I will indicate that the Department of Justice has, in their own brief, indicated that BART is required to comply with other DOT regulations. And in particular, it has to rely on – it has to comply with the Department of Transportation regulations, and this is found in their brief, Amika's brief on page 10. They provide another six areas in which they are required to comply with DOT regulations for the provision of services. The provision of a service is different than barrier removal for a facility. Therefore – and this is the way that I think it is possible for us to harmonize these cases, which is always the goal, to harmonize the statute and the DOT regulations, because I think that the argument has been so skewed to one sign in a route that everyone agrees is not usable by visually impaired persons. The real question is, is BART able to say that they have to do nothing to provide persons the ability to locate their facilities? The entrances, how to come down the stairs, those are questions that the DOT regulation, in particular, that says that public entity transportation entities must make available to individuals with disabilities adequate information concerning transportation services. This is not a barrier removal under Appendix A. Now, the important thing to know, and I think what – because these regulations are somewhat complicated, the 37.9 Safe Harbor speaks to the issue of when a facility will have removed its barriers. Transportation facility. Not the programs and services. Programs and services are different. So did the district court actually address information services? Yes. And the district court – what the district court did is it said, because Appendix A says that if you comply with these building regulations, you are readily accessible, that's why it was arbitrary and capricious, because it didn't address the information issues, because the district court found that it was exclusive. Now, the DOT regulations themselves, in Regulation 37.5, specifically state that they are prohibited for discriminating in the programs and services. The DOT's own analysis indicates or says this means that public transportation facilities and all public entities have to also comply with general discrimination issues. So for example, we can't have visually impaired persons using the accessible route at these BART facilities because it is far away, it can't be located, it's not usable, but also because it is not the integrated setting for the provision of services appropriate for visually disabled people. Visually disabled people don't need accessible routes. And that's because the definition of accessible route means a route with no obstructions. Stairs are obstructions. Stairs are needed. So you might put the visually impaired need is information on the regular route, in effect.  And the reason that we say that is because we have uncontroverted evidence through Dr. Samuel Janensky, who is a visual theoretician, who actually developed the contrast striping regulations in California, as well as the directors of mobility and orientation centers that say that it's impossible to train people to use accessible routes. That's not what is appropriate for their needs. Visually disabled persons, as also provided by the declarations of our appellate, listen for audio cues. Where is the crowd going? We know the crowd, when they enter a BART station, is going to go either to the ticketing agency and then to the platform. They are not going to wait for a wheelchair user to try to follow a wheelchair user around everywhere. And I do want to address the issue of the contrast striping. Before you get to that, let's just get the statutory structure straight for a second. So I want to ask you then, are there any regulations that set out what one would do to provide adequate information that are not part of this appendix? No. And there's a very good reason why there are no regulations. They're not going to come up with regulations for that. Because programmatic access is too individualized to a public entity. There are no regulations for programmatic access. The regulations are for facilities. So when we concede that BART's train stations provide an accessible route that complies with the building structure for an accessible wheelchair route, that doesn't take care of the issue of providing the services for visually impaired persons so they can actually get to the stations. Now, in terms of harmonizing these codes, the DOT codes particularly say, apart from these regulations, everyone has to comply with the general discrimination issues. And one of those is you communicate the location of accessible facilities. That's an actual mandate under the regulations. That's the Department of Justice regulation. Department of Transportation has a regulation that you tell people with visual disabilities the adequate information concerning transportation services. And what regulation is that? That is the regulation 49 CFR 37.167F. And just to put this in context, there are also no regulations on how to adequately inform deaf people about the services, because they're not physical building issues. Now, we have indicated to BART that if they provide color contrast striping, that would go a very long distance. But that's not their only option. They can use radio transmitters. They could even have a person, an employee standing, for example, at the union station in Los Angeles. So let's take color contrast striping then. As it currently stands, that was an issue considered under the facilities regulation, but in effect they demurred 13 years ago. But now you're telling me that color contrast striping actually would fall under services for information. Is that correct? I'm saying that that's correct. One of the things that you can do when you deal with visually impaired persons, you have to give them cues that they can understand. They cannot understand signage. They can't see it. But they can, many people, including our appellants, our scribes. The issue is that you have to provide the services. One of the ways to do it is color contrast striping. But it is not the only way. What I believe is not appropriate under any reasonable understanding of the ADA is that you do nothing. And remember, the original information from the Access Board in 1991 said there were no studies. Now they've got, in 2004, draft regulations, again no studies. It isn't that there have been so many studies and nobody knows they're effective. Why don't you sue the DOT? Because the DOT, because we're not asking that the DOT make color contrast striping a regulation. We're asking that BART evaluate their programs and services and come up with a way to provide some way for safe use of their facilities. How do you do that as a practical matter when, for example, in the striping there seems to be conflicting testimony that may have actually been the cause of one of the accidents because of the? Actually, it wasn't. And I do want to clarify that, because I think that appellants incorrectly stated Appelli's position. Appelli's position on the color contrast striping problem at the 19th Street Station wasn't the yellow contrast striping. It was that they had put a weather tread over the stairs that had very high, it was a shiny metal. So it was the outside one that came in and glared at the, when you came looking, you couldn't see the stripe for the glare. Now, appellants forgot to indicate that their own engineer testified during deposition that those stairs caused a lot of glare and they had a lot of complaints about that glare. We're not indicating that all of their contrast striping is wrong. We're indicating that you have to see the yellow stripe in however you want to put your tread down. And let me just step back to make sure, I want to make sure I understand this. If the district court said that the regulations were arbitrary and capricious because they didn't provide for this, was the district court wrong because she was looking at facilities and not the programmatic services? That's exactly what happened. And because So if your position is that that part of the ruling was wrong, did she make a separate ruling on a violation of 49 CFR 37.167? No, she did not. Because what happened was Let me just ask you, why didn't you appeal then? Because while we did appeal the programs and services issues, and I appealed all of these, not just one. I also appealed 35.130, which is the integrated setting, the communication. So I did appeal all of those. That is in the record. But I also want to say one thing about color contrast striping that is extremely important in this issue for defendants. Defendants have said that nobody knows if it's really effective and have sort of belittled the issue of yellow contrast striping. But in California, BART has had to put yellow contrast striping on their stairs since 1983. So it is very reasonable for visually disabled persons using BART facilities to look for that color contrast striping because many of the stations have it under California law. That's one of the reasons we wanted them to do something that was already standard for visually disabled persons using their stations, because color contrast striping is taught in California as a visual cue. It may not be for the access borders of the whole country, but it is in California, and BART uses color contrast striping. I'd like to go back for a minute to the statute and the regulations that were often pursuant to it. As I view it, the statute. I'm sorry. Which statute? The ADA statute. It says that it should be considered discrimination for purposes of the statute for a public entity to fail to operate a designated public transportation program or activity conducted in such facilities so that when viewed in the entirety, the program or activity is readily accessible to and usable by individuals with disabilities. It's that latter phrase, is it not, that you're suing for? That's correct. Yeah. Readily accessible and usable by individuals with disabilities. Now, is it not true that as a part of that statute, the Department of Transportation was specifically empowered to develop regulations to implement that? Absolutely. Well, and they did, right? They did for transportation facilities. There are no regulations. Well, that's what we have here. Do we not, transportation facilities? We do, but that is not the only thing we have. That is why an appellee concedes that the wheelchair route does comply with the building standards for wheelchair routes. Well, no, but this is to make it public transportation readily accessible to and usable by individuals with disabilities. Now, visually impaired are persons with disabilities, right? Right. Now, didn't the result of that, of that statute, to designate the Department of Transportation to develop the detailed regulations, isn't that a delegation to the Department of Transportation to develop those regulations? Absolutely. Well, if that's the case, then how do we rule directly just from the statute and not the extension of the statutory requirements by Department of Transportation regulations? That's what we're looking at, is it not? Yes, but as I have just indicated to the Court, the Department of Transportation has in fact formulated regulations for the provision of services and programs to visually disabled people. And that is by requiring that there are adequate information to provide, to be able to use their transportation services. My understanding of your argument, maybe I misunderstood, is that we're only looking directly at the statute. We're not looking to the Department of Transportation regulations? No. And in fact, that is what I'm saying was so problematic at the district level. It was too, the scope of inquiry was too narrow. I am saying that the Department of Transportation regulations do actually provide the issues that we're talking about. And the safe harbor applies to transportation facilities, not to the operation and programmatic access that is required under additional. I mean, because this is totally not, I mean, your argument, I don't find anywhere in the way the district court conceived or heard the case. Well, it did hear the case, and we did actually. It didn't hear what you were saying, apparently. It didn't hear what I was saying. As I said, the Department was extremely successful in leading it to one signage issue on the route. But that isn't, but I did argue the programmatic access. I did argue the additional DOT and DOJ regulations. Because the district court apparently didn't listen to you, what remedy are you seeking? Well, I think that, Your Honor, we can, in fact, the Court can, in fact, find exactly what His Honor just indicated, which is when viewed as an entirety, BART is not accessible, readily accessible to persons with physical disabilities. It just isn't. And they can find that because they have not complied with all of the DOT regulations. Well, we can't find that. I mean, we don't find anything in the appellate court. So it's really a question, I think, which is why I was trying to get the statute straight. Even if I agreed with everything you said about what they need to do or that they should do something and they didn't do enough, let's just say in principle I agreed with you. I'd still need to figure out whether, in fact, your argument is before us on appeal as opposed to the BART argument that the regulations aren't arbitrary and capricious and that they complied with them in any event. It's like two separate issues. And I understand what you're saying, Your Honor. See what I'm saying? I understand that. I'm trying to see if we can come up with something that I believe has to be a reasonable interpretation of all of these codes. The district court was wrong to say that it's the exclusive court, that the exclusive issue of 37.9 is all that has to happen for BART to have complied with all of the regulations of the Department of Transportation. That's wrong. The question then goes, if we need to remand this at all, to remand it to find out whether or not they're complying with the ability for information concerning their transportation services and their general discrimination regulations requiring integrated setting and location of entrances and exits. Did you appeal that to us? Did I appeal that? Yes, I did appeal the fact that the DO2 regulation 37.9 is not exclusive. I did argue that the rest of the DOT on DOJ apply. So, yes, I did. I'm still trying to figure out what the remedy you're seeking. One thing we do sometimes is to say, although the district court was wrong, we can decide the case on anything that appears in the record that supports the judgment. Is that what you're asking? Yes, I am. I'm sorry I didn't say that. It's fairly clear. The court can. That's why I said the court can find exactly that it discriminated against persons with visual disabilities. I'm still back to the statute and the DOT regulation. You say, and I believe this is correct, that the key issues were the readily accessible to and unable by individuals with disabilities. That's kind of the key phrase, is it not? It's readily accessible under the congressional record means the ability to get to and go through and use a facility. Right. So the regulation that we're talking about now is for purposes of this part, a transportation facility shall be considered to be readily accessible and usable, that very phrase, by individuals with disabilities if it meets the requirements of this part and the standards set forth in Appendix A. So what they're saying is Congress has delegated to us, the Department of Transportation, to determine what is actually readily accessible and usable by individuals. And this is what we find in our various regulations, is the meaning of readily accessible and usable by individuals. So if that's the case, that the Department of Transportation is taking the delegation by Congress to decide what is readily accessible and usable by individuals, why aren't we bound by that? Because that is not the only, and if you'll read the, if you'll read the, let me read that again and tell you how I, how I think it actually reads. For purposes of this part, this part is subsection A. Subsection A includes section 37.5, the one above it. No entity shall discriminate against an individual with a disability in connection with the provision of transportation services. The analysis done by the Department of Transportation says this applies the general discrimination from DOJ to virtually every public facility. So if, in fact, BART did not discriminate against visually impaired persons and had complied with the building regulations in Appendix X, it would be a safe harbor. By safe harbor. That, that's kind of a poor term. Everyone uses this in the briefs and everything. Safe harbor. What we're really talking about is the Department of Transportation defining what is meant by readily accessible and usable by individuals. Absolutely correct, Your Honor. But again. It's not an immunity sort of thing. It's not an immunity. Yeah. But what I'm indicating is, again, it is not the one sign on the accessible route. Part A includes, some part that we're discussing includes the general requirement that no one be discriminated against in the provision of services. That includes that. So if BART complied with the DOJ requirements for general discrimination and did the accessible route, then it would have complied with the requirements of 37.9, and it could come up and say, we have no liability. We've done everything we need to do. But what they're saying instead is, we have complied with the transportation facility regulations for an accessible route. Therefore, if people are falling off of the stairs, that's not our concern. Go talk to the access board. But I'm saying that's not what's actually here. What is subpart E35163 is information and signage, and it says you have to make sure that they can obtain information as to the existence of accessible services and activities. Yes, that's part of the non- The non- The general non- The non-A. The non-building code portion. Because programmatic access, as I said, doesn't have regulations to tell you how to operate it properly. Because, for example, let's say that they had a fully accessible car train. But they decide, let's say that BART or somebody else said, it's too difficult to deal with visually disabled people because they go all over the place. They get lost. What we'll do is we'll tell them they have to all use this one cart. They have to use this one cart because that way we can take care of them and we can guide them. That would be segregation, unnecessary segregation. So even though the train could be completely accessible, the way that their the policies and procedures of operating their facility could be a discriminatory effect. I guess what I'm having trouble with is that because subpart A talks about accessible routes or the facility has to be accessible, and then this regulation says you need to give people information about the accessible route or facility. But if the facility under the Department of Transportation regulations, in effect here, the route and the signage are collapsed, in effect. So it's part of the facility in terms of whether it's accessible or not under A. And so it's not like, you know, it's not like do we have brochures, do we have audio tapes, do we have other things to tell you what we have. I mean, it's kind of hard for me to exactly distinguish where you draw the line. Well, I think that you draw the line in different ways for different disabilities. For example, a deaf person will never have need for the accessible route. That's not their particular to their needs. But they do need information, and they need information that's not audible. So for them, signage really works. But if you can't see it, signage has no information to impart to you. So that can't be what that means in terms of. No, but you're the deaf person I think stands as distinguished here because the deaf person doesn't need access. The deaf person needs information, like, you know, that there's a train, that there's a car, that there's a whatever. Here you're saying that you need the facility to have cues that are part of the facility, which is different than saying here's a brochure that's, you know, a written brochure, or here's one that is accessible to deaf persons. Not necessarily at all, because. Where would I look for a definition so that I could figure out in your view whether what you're asking for is really part and parcel of the facility or if it would come under the information regulations? Well, I think it could come under both, but it certainly is part of the information because you need it. 35.163 states, A, a public entity shall ensure that persons, including persons with impaired vision or hearing, because those are different issues, can obtain information as to the existence and location of accessible services, activities, and facilities. That tells you the information to find out where it exists. Where is the entrance? How do I get down the stairs? B says, a public entity shall provide signage at all inaccessible entrances to each facility, directing users to an accessible entrance. So you don't But this all ties back to accessible facility, which you find in A. What I'm indicating is that's not necessarily true at all. If you look at A, it says interested persons, including persons with visually impaired vision and hearing, because they are distinct from facilities, can obtain information as to the existence and the location. We're asking for the location of the stairs. How can you tell you're not walking up the stairs? But, you see, that's really the facility. It's not a question of a facility exists. That's then a question of what is the facility. No. It says can obtain information as to the existence and location of accessible services, activities, and facilities. How can a train station be accessible? The district court made no ruling on this. They ruled that this was not part of the DOT regulations, and again, that it was exclusive, that the DOT regulation was exclusive. All right. Okay. I think you've got your argument. Unless there's other questions from my colleagues, we'll give BART some additional time if you need it. Thank you. You have some time left, but we'll give you five minutes. Thank you. Thank you. First, I did want to emphasize my agreement with Judge Hugg in the question of what does, what do you do with a statute that specifically delegates rulemaking authority to an agency? You read the statute and the agency regulations in peri materia. And if the agency regulations are a reasonable interpretation of the statute, then they have the force of law. And, therefore, when the Department of Transportation says a facility that complies with this part, which is all of Part 37, by the way, this part, and Appendix A, which is ADAG, it shall be considered readily accessible and usable  That has the force of law. The new argument that counsel make, and I say new because it does not appear in their, in their brief, is the argument that the DOT, excuse me, the DOJ regulations also apply here. The DOJ programmatic regulations apply here. And this gets a little, this issue of programmatic versus facilities regulation becomes a little bit difficult to parse out. But, in fact, the district court, I think, made a very good analysis of this. If we are talking about installing either signage or contrast striping on chair, on chairs, on stairs, we are talking about design alterations. And design alterations are the exclusive, design alterations of transportation facilities are within the exclusive purview of the Department of Transportation. And counsel cited to you, among other things, counsel cited to you 28 CFR Section 35.167, which I can't comment on because it's nowhere listed in their brief. But I can comment on 35.165, which has to do with the signage. And that is the part that the judge, that Judge Wilkins found arbitrary and capricious. Counsel indicated to you that Judge Wilkins found that the safe harbor is arbitrary and capricious. What she found was that the lack of a regulation similar to that of 35.163, I mean 165, is arbitrary and capricious. And 35.165 talks, as you indicated, Judge McCown, in general terms of making 165A talks in general terms of making. 163? Is it 163 or 165? I think it's 163. It's called information and signage. Okay. Just to make sure we're talking about the same one. Because that's what she was talking about. Right. Right. It talks about information and signage. In other words, telling people how, you know, making it possible for persons with disabilities to find out where these facilities are. Well, BAR operates telephone lines for the handicapped, including, I forget, TDT lines and everyone else. It issues brochures in Braille. It gives that kind of information. The important point here is 35.163B, which refers directly to signage. And the issue about signage is important, one, because it goes to facilities, which is directly covered by the Department of Transportation, and two, because it goes to an issue that plaintiffs and their experts say wouldn't have helped them at all. I mean, it's so ironic to say it's arbitrary and capricious that you don't have a regulation like the DOJ's when you have the plaintiffs and their experts saying, but those regulations wouldn't help us anyway. That's the central problem here. Incidentally, there was a claim that there had still been no studies of the wayfinding needs of the visually impaired since 1991. My reply brief goes into detail over what the DOT, not the DOT, but the Access Board has been doing in conjunction with the A117 Committee and the International Code Council. They are slow. They have, in fact, come up in 2004 with a recommendation, which I would assume, given that the recommendation is nonmandatory, is, and I don't have regulatory history to back me up, but I would assume that it is an experimental thing to see whether or not this is going to be effective. You can't simply say, bring an expert in again and say this is the most effective way when you have an agency made up, in fact, of disabled individuals who study this all the time, and they come up and they are trying to come up with effective and efficacious ways of aiding the disabled. And I think the word is efficacious. You have to, you know, you can throw anything out there, but you have to decide whether or not it's good. The last point, since I'm running out of time, is plaintiffs indicated that we misunderstood the contrast striping issue, which has been required since 1983. If you look at page 3 of our brief, there are citations to the many, many places in which plaintiffs claim that the contrast striping at the 19th Street station was inadequate, and it's, I believe, page 320 of the record, in which the Court finds that it complies in all respects with California building code, and that has not been challenged on appeal. I assume I'm out of time, but I'll answer any other questions. I don't think we have any. Thank you. I thank all counsel for your arguments. They're very helpful. It's a regulatory maze. We'll leave it at that for now. Thank you. Thank you.
judges: Hug, Alarcon, McKeown